UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | |
|---|---|
| In re: | ) |
| | ) |
| KAREN SUE FOX, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| ——————————————— | ) Case No. 12-32462 HRT |
| VERUS BANK OF COMMERCE, | ) Chapter 12 |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) |
| | ) |
| KAREN SUE FOX and | ) |
| DANIEL A. HEPNER, Chapter 12 Trustee, | ) |
| | ) |
| Respondent. | ) |

## ORDER ON MOTION FOR RELIEF FROM STAY

This case comes before the Court on the *Motion for Relief from Stay* (docket #7) (the "Motion") filed by Verus Bank of Commerce (the "Bank").

The Court heard evidence and argument at a final hearing on this matter on December 21, 2012.

### I. FACTS

Debtor filed a voluntary petition under chapter 7 on October 31, 2012. On November 2, 2012, the Bank filed the instant Motion.

Debtor owns property located at 3172 Stargazer Court, Fort Collins, Colorado (the "Property"). For the purposes of hearing on this matter, the parties agree the value of the Property is $779,150.00. The Property is located in Larimer County, Colorado, and consists of a 10 acre tract of real property upon which Debtor's 9,000 square foot residence is situated with the balance of the Property used for agricultural purposes. Those agricultural purposes include grazing cattle and growing hay and alfalfa.

The parties agree that the total debt owed to the Bank is $1,359,903.11. There are two separate obligations involved. The Bank's original connection with the Property is an obligation incurred in favor of its predecessor in interest, Larimer Bank of Commerce, in 2008. That debt is secured by a second deed of trust on the Property and an assignment of rents. In 2012, the

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

Bank acquired the note and deed of trust from the former first deed of trust holder.  The balance due on the first deed of trust note is approximately $669,000.00 with variable interest currently at 5% per annum and the balance due on the second deed of trust note is approximately $675,000.00 with variable interest currently at 7.5% per annum.

In the Debtor's plan, she will seek to modify the Bank's debt to make it payable over 30 years with interest at 4% per annum.[1]  The Debtor testified that she believes, under the plan she intends to propose, the monthly principal and interest on the modified obligation to the Bank would be $3,719.00.[2]

The Debtor anticipates that her plan will be funded by farming operations conducted on three tracts of land.  In addition to conducting farming operations on about 8 acres of the Property, there is a 100 acre tract of land [the "100 Acres"] adjacent to the Property upon which her former spouse, Aaron Million, conducts farming operations and another adjacent 5 acre tract [the "5 Acres"].

The 100 Acres is owned by one Jeff Garland.  Aaron Million testified to a verbal agreement with Mr. Garland to farm the 100 Acres.  According to Mr. Million, Mr. Garland has given him the right to farm the 100 Acres, rent free, for five years.  The verbal agreement is terminable by Mr. Garland on any anniversary date of the agreement.  There are two homes on the 100 Acres.  Mr. Million collects the rental income from those homes.

Under the domestic court order that terminated the marriage of the Debtor and Mr. Million, there is no order for either alimony or child support payable by Mr. Million to the Debtor.  Historically, Mr. Million has paid some of the Debtor's expenses, such as paying for

---

[1] Debtor's anticipation of confirming a plan reflecting interest at 4% per annum is optimistic.  If a secured creditor objects to a debtor's proposed cram-down interest rate, under *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), bankruptcy courts calculate the appropriate interest rate by adding a risk premium to the national prime rate of interest.  *Id*. at 479-480.  *See also First Nat. Bank v. Woods (In re Woods)*, 465 B.R. 196, 207 (B.A.P. 10th Cir. 2012) (holding that "the *Till* rate should be applied in Chapter 12 cases").  The current prime rate reflected in the Wall Street Journal is 3.25%.  Courts typically add between 1% and 3% as a risk premium.  *Till*, 541 U.S. at 480.  Depending upon the evidence presented at a confirmation hearing, the Court would expect a cram-down interest rate to fall somewhere in a range between 4.25% and 6.25% per annum.

[2] In *In re Woods*, the 10th Circuit B.A.P. approved the bankruptcy court's use of a cram-down interest rate of 2% over prime in a chapter 12 case.  465 B.R. at 205.  If a similar risk premium were applied in this case, the cram-down interest rate would be 5.25% and would result in a monthly principal and interest payment, based on a 30 year amortization, of $4,302.50.

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

utilities and groceries, but there is no legally enforceable obligation to do so.[3]  Going forward, the Debtor and Mr. Million testified that he will pay her $3,000.00 per month "in lieu of support."  There is no history of such payments.  The first payment was tendered to the Debtor on the day of the hearing in this matter.

The Debtor's Amended Schedule I shows that she anticipates gross rental income from the houses on the adjacent 100 Acres of $2,250.00 monthly.  Combined with the anticipated $3,000.00 per month in lieu of support from Mr. Million, Debtor's Amended Schedule I reflects gross monthly income of $5,250.00.  Debtor's Amended Schedule J reflects monthly expenses of $5,180.00 and a net monthly income of $70.00.  However, there is a note on Amended Schedule I as follows: "The Debtor's income does not reflect anticipated income from the production of hay and alfalfa, or grazing fees, as the Debtor is still in the process of formulating projections for these types of income as part of her reorganization effort."  A similar note on Amended Schedule J states: "The Debtor's Schedule J Addendum/Business Income and Expenses does not reflect anticipated expenses from agricultural operations as the Debtor is still in the process of formulating projections for these types of expenses as part of her reorganization effort."[4]  Notwithstanding that the Debtor filed her amended income and expenses schedules one day before the hearing in this matter, they provide the Court with no projections for the Debtor's farming operations aside from the $2,250.00 monthly income from rental homes on the adjacent 100 Acres, which the Debtor does not own.

------

[3] The Debtor put the parties' Stipulation and Separation Agreement (the "Stipulation") into evidence absent the referenced attachments and supporting schedules.  The final orders entered in the domestic case were not put into evidence.  Aaron Million testified that he believed the Stipulation was incorporated in the final dissolution decree.  The Stipulation is remarkable for its lack of specific obligations.  The parties agreed that various entities – one to hold the Property; one to hold other property interests; and one to hold interests in a water project – would be formed and the Debtor would be the main beneficiary of income derived from those entities.  None of those entities were ever formed and, due to business reversals, the only current income producing asset remaining in the ownership of either the Debtor or Mr. Million is the Property.

[4] Debtor filed this case under chapter 7 on October 31, 2012, the date upon which the Bank was scheduled to foreclose its deeds of trust on the Property.  The Bank filed this Motion two days later on November 2, 2012.  Following the filing of the Bank's Motion and one month prior to the evidentiary hearing in this matter, on November 20, 2012, Debtor filed her motion to convert this case to a reorganization case under chapter 12.

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

## II.  DISCUSSION

The Bank seeks relief from the automatic stay under 11 U.S.C. § 362(d).  The Bank is entitled to relief under § 362(d)(1) "for cause, including the lack of adequate protection of an interest in property of such party in interest."  Under § 362(d)(2), the Bank is entitled to relief if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."

The Court will begin by discussing § 362(d)(2).  The parties are agreed that there is no equity in the Property.  Its stipulated value, for the purposes of this hearing, is $779,150.00 and the Bank holds a total debt of $1,359,903.11, secured by deeds of trust against the Property.

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*  This means, as many lower courts . . . have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375-76 (1988) (emphasis in original ) (citations omitted).

In this case, the Motion was filed immediately after the Debtor filed her petition under chapter 7.  Since the Debtor initially filed this case under a liquidation chapter, relief to the Bank would have been virtually automatic because there is no prospect of reorganization under chapter 7.  However, subsequent to the filing of the instant Motion, Debtor converted her case to a case under chapter 12.  The consequence of that conversion for the Bank is that bankruptcy courts are generally reluctant to grant relief from stay early in a reorganization case before a debtor has had an opportunity to formulate a reorganization plan.  The bar is quite low for the Debtor to demonstrate that she has a plan in prospect.  Nonetheless, "while the bankruptcy courts demand less detailed showings during the [period of time] in which the debtor is given the exclusive right to put together a plan, even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief."  *Id*. at 376 (citations omitted).

The Court will grant relief to the Bank under § 362(d)(2) for two reasons.  First, the Property is not necessary for the Debtor's reorganization because the income producing potential of the Property cannot justify the burden of retaining the Property as part of a reorganization plan.  Second, even by the low evidentiary standard that is appropriate early in a reorganization case with respect to a plan in prospect, Debtor has not demonstrated a realistic prospect of

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

reorganization because she possesses no legal rights to the majority of the income upon which her plan would depend.

Under § 362(d)(2)(B), the test of whether property is "necessary to an effective reorganization", as articulated by *Timbers*, is a two part test: "[w]hat this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*." 484 U.S. at 375-76 (emphasis in original). Part one of the test is whether the Property is needed for the execution of the Debtor's plan. If a piece of property is not needed for a debtor's proposed plan of reorganization – if the proposed plan will function equally well without the property at issue – then a movant is entitled to stay relief regardless of the debtor's overall reorganization prospects. If a court can find that the property at issue is essential for the debtor's proposed plan then it must consider part two: whether the Debtor's proposal amounts to a plan "*that is in prospect.*" *Id.* The focus of the first part of the *Timbers* test is the purpose of the subject property's inclusion within debtor's proposed reorganization. The focus of the second part is on the feasibility of an effective reorganization. But, if a debtor cannot demonstrate that the specific property at issue in the motion for stay relief is needed for the debtor's proposed plan, the feasibility of a debtor's plan proposal is really not relevant.

A. The Property Is Not Essential to the Debtor's Proposed Reorganization

Here, the Property is the sole income producing asset owned by the Debtor. The Debtor testified that she expects to generate gross revenues of $60,000.00 from production of hay and alfalfa but the record contains no corroborating evidence of the Property ever producing income of that level. After deduction of $7,200.00 of expenses, the Debtor expects to net $52,800.00 from farming the Property. She testified that she will propose a plan to restructure the Bank's debt over 30 years at 4% interest. While a 4% cramdown interest rate is optimistic, the Court will use the Debtor's figures. At the 4% interest rate, monthly principal and interest would run $3,719.78. The property insurance currently in force on the Property runs $4,421.00 yearly and the 2012 real property taxes were $5,740.00. Just the yearly cost of principal and interest on the restructured debt plus property taxes and insurance, would be $54,798.36. The Debtor's own projections are $2,000.00 less than those costs alone. The above figures do not even take into account the maintenance costs associated with the 9,000 square foot home located on the Property.

Based on the Debtor's testimony, the Court can give scant deference to her income projections for the Property. The Debtor bases income projections on current hay and alfalfa prices. The Debtor testified those prices are at high levels because of the drought conditions in Larimer County during the past growing season. But she projects a level of production at what she refers to as the historically average range. If current prices are high because of the drought, the Court doubts they will remain at those levels during a more abundant growing season.

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

Conversely, if the drought continues, it seems unreasonable to expect production levels to hit the historic average.

The Court is persuaded that the Debtor's projections substantially understate the shortfall. Not only does the Court lack confidence in the Debtor's income projections, Debtor's estimate of costs includes a cramdown interest rate that is less than one percent over the prime rate. The interest rate projection is unrealistically optimistic. In the Court's experience, it is virtually unprecedented, absent the secured creditor's acquiescence, to force a creditor to accept interest on its secured claim of only .75% over prime. A more common figure would be closer to 2% over prime. That would add nearly $7,000.00 annually to the Debtor's cost projections.

There is also the out-of-pocket expense of maintaining a 9,000 square foot home on the Property that must be taken into account in order to determine whether retention of the Property represents an essential element of the Debtor's plan or is a net burden to the chapter 12 estate. The record contains scant evidence going to that issue. Debtor's Amended Schedule J, line 3, reflects a figure of $20.00 monthly for home maintenance. At hearing, the Bank's witness estimated that the Bank's cost to maintain the Property following foreclosure and pending disposition of the Property would be between $1,000.00 to $2,000.00 monthly (including the cost of taxes and insurance). The Court can give no credence to the Debtor's $20.00 estimate and is inclined to accept the Bank's estimate as being much closer to the mark. After deducting the monthly cost of taxes and insurance from the Bank's estimate, the result is monthly maintenance costs in the range of $150.00 to $1,150.00. An average monthly figure would likely fall toward the middle of that range to maintain a structure of that size.

A factor that the Court is unable to quantify is the cost of replacement housing for the Debtor and her family. Unlike a strictly production-oriented asset, the Property also contains the Debtor's home. That adds an element of value that is not accounted for in the production projections and the Court has no evidence that speaks to the issue. However, the Court need not specifically quantify that factor. The Debtor bears the burden with respect to necessity for reorganization. *In re Gindi*, 642 F.3d 865, 875 (10th Cir. 2011). The Court is persuaded that the Debtor's projections substantially overstate the production potential of the Property and understate the costs associated with retaining the Property such that any value the Debtor would derive by being able to continue living in the home situated on the Property is offset by the actual shortfall between the Property's revenue production and the costs of retaining the Property.

There was testimony concerning generating income by granting an easement on the Property to East Larimer County Water District and North Weld County Water District for the construction of a water line across the Property. There was evidence that the districts have extended an offer of $50,682.00 for the easement. There was also testimony concerning the granting of an agricultural conservation easement on the Property to the City of Fort Collins. Debtor produced a letter from the city extending an offer of $100,000.00 for the granting of the

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

easement. However, the granting of those property interests is not a decision that the Debtor is entitled to make unilaterally. As is typical, the Bank's Deed of Trust contains a due on sale clause that prohibits the transfer of any interest in the Property without the Bank's consent. The grant of those easements would, of course, impact the value of the Bank's collateral. Absent evidence of the Bank's consent, the Court gives no weight to the testimony concerning those income sources.

The totality of the evidence persuades the Court that, instead of representing a benefit to the Debtor's overall reorganization plan – in *Timbers*' terms, "essential for an effective reorganization," 484 U.S. at 376 – the Property represents a net burden. If there is to be an effective reorganization in this case, that reorganization is more likely to succeed without the burden of retaining the Property because the Court concludes it is more likely than not to represent a monthly revenue loss to the Chapter 12 estate than an asset that generates revenue to aid in the Debtor's plan to pay her creditors.

B. The Debtor's Plan Is Not a *Plan in Prospect*

As to the other elements of the Debtor's plan, there was much testimony concerning the farming of the 100 Acres and the 5 Acres.

The 100 Acres was formerly owned by an entity known as Million Agricultural Investments ("MAI"). Debtor had no ownership interest in MAI; it was owned by her former husband Aaron Million and his family. Historically, farming operations and ranching on the 100 Acres contributed to the family income of Debtor and Mr. Million. The 100 Acres is now owned by Jeff Garland, a family friend. Through a verbal agreement with Mr. Garland, Mr. Million claims the right to farm the 100 Acres and to receive income from the rental of two homes located on the 100 Acres. This verbal agreement generally requires Mr. Million to maintain the property and pay expenses in return for the rights to take income from the property. It is a five year agreement terminable by Mr. Garland on the anniversary date each year.[5]

---

[5] Under the Colorado Statute of Frauds "Every contract for the leasing for a longer period than one year or for the sale of any lands or any interest in lands is void unless the contract or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party by whom the lease or sale is to be made." COLO. REV. STAT. § 38-10-108. However, a "confidential relationship" may, at times, be found between the parties to an oral agreement that may take the agreement outside of the statute of frauds. *Jarnagin v. Busby, Inc.*, 867 P.2d 63, 66-67 (Colo. Ct. App. 1993). Moreover, part performance may make an oral lease enforceable regardless of the statute of frauds. *L.U. Cattle Co. v. Wilson*, 714 P.2d 1344, 1347 (Colo. Ct. App. 1986). The Court will not assume that Mr. Million's agreement with Mr. Garland is unenforceable. To the contrary, notwithstanding serious doubts concerning legal enforceability,

(continued...)

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

     In turn, both the Debtor and Mr. Million testified that the benefits of the verbal lease with Mr. Garland flow through to the Debtor.  Rents from the two rental homes on the 100 Acres are paid to Mr. Million.  The testimony was that, currently, the Debtor receives a benefit of $2,250.00 per month from those rents.  The Debtor testified that sometimes Mr. Million gives her the cash from the rents and sometimes he buys groceries and pays utilities.

     The Debtor's anticipated income from the 100 Acres is tenuous.  The claimed right to take income from the 100 Acres belongs to Aaron Million, not the Debtor.  Assuming full enforceability of the verbal agreement, it is terminable – at will – by the owner of the 100 Acres on any anniversary date of the verbal agreement.  Moreover, Debtor has no legal claim to that income.  For any of the anticipated income from the 100 Acres to flow to Debtor's chapter 12 estate, Mr. Million depends upon the continued good will of Mr. Garland and the Debtor depends upon the continued good will of Mr. Million.  That is a chain altogether too attenuated for the Court to accept the 100 Acres as providing a foundation for a plan that has a reasonable chance of being confirmed within a reasonable time.

     The Debtor testified that the 5 Acres is owned by a neighbor.  Nonetheless, she also testified that "we water it; we farm it; we take all the proceeds."  Again, the Debtor has to depend on the continued willingness of a neighbor to allow her to take income from the 5 Acres.

     Finally, $3,000.00 per month of the Debtor's current budget as reflected on her Amended Schedule I is a voluntary cash payment to be made directly to her by Aaron Million "in lieu of support."  There is no history of such payments to refer to.  The one and only payment made by Mr. Million was made on the date of the hearing in this matter.  According to the testimony, that is a figure that the Debtor intends as adequate protection to be passed through to the Bank pending confirmation of her plan.  When questioned about his ability to make the $3,000.00 per month payment to the Debtor, Mr. Million testified that he had gotten a loan from Jeff Garland, the owner of the 100 Acres.  The loan is undocumented but Mr. Million did testify that the principal amount of the loan may go up to $50,000.00 and the loan is for a term of two years.  When asked about his ability to service that loan, Mr. Million made vague references to family resources and possible future income from his involvement in a water project.  Again, the Court has difficulty viewing this new $3,000.00 per month pledged by Aaron Million as a reliable income stream for funding the Debtor's reorganization plan given that Mr. Million testified that he has no current source of income and is dependent on family and friends to fund the $3,000.00 he has pledged to provide to the Debtor.

--------

    [5](...continued)

the Court assumes the good will of the parties to the verbal agreement so that a legal test of enforceability is unlikely to take place.  Nonetheless, by the terms testified to by Mr. Million, at best it is an agreement that is only continued from year to year at Mr. Garland's option.

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

Where a debtor is in the initial weeks of a reorganization case, the Court does not expect a debtor to be able to outline a plan with exacting detail. The Debtor in this case enjoys a very forgiving standard of proof in demonstrating that she is able to put together a plan that has a reasonable possibility of being conformed within a reasonable time. But when the Court considers the totality of the evidence with respect to the reorganization plan the Debtor anticipates placing before her creditors, the Court finds that the Debtor has failed to meet that burden.

The Property that is the subject of this Motion is the only income producing asset owned by the Debtor. The evidence persuades the Court that Property is far more likely to produce a net income loss to the estate as opposed to being a net generator of revenue to further the Debtor's reorganization efforts. As to other sources of revenue for her reorganization, the Debtor describes income to which she has no legal entitlement. Virtually all income streams the Debtor testified to are revenues that depend on loans or gifts from Aaron Million's friends and family. A plan based on such sources of income would not allow the Court to make a finding that "the debtor will be able to make all payments under the plan and to comply with the plan," 11 U.S.C. § 1225, as it is required to do in order to confirm a chapter 12 plan of reorganization. Debtor's revenue projections are simply too tenuous and too speculative.

In sum, the Court finds that the Property is more burden than benefit to the Debtor's plan of reorganization, as she has outlined it to the Court. Further, the majority of the income Debtor would rely on for her plan is highly speculative because it derives from sources to which she has no legal entitlement. As a consequence, the Debtor has not carried her burden to show that the Property is necessary for a plan of reorganization that has a reasonable chance of being confirmed within a reasonable time. Therefore, under 11 U.S.C. § 362(d)(2), the Court must grant the Bank's Motion for relief from stay.

C. The Debtor's Adequate Protection Proposal

Debtor has proposed paying the Bank $3,000.00 per month as adequate protection. Under chapter 12,

> when adequate protection is required under section 362 . . . of an interest of an entity in property, such adequate protection may be provided by–
>> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;
>> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

    (3) paying to such entity for the use of farmland the reasonable rent
    customary in the community where the property is located, based upon the
    rental value, net income, and earning capacity of the property; or
    (4) granting such other relief, other than entitling such entity to
    compensation allowable under section 503(b)(1) of this title as an
    administrative expense, as will adequately protect the value of property
    securing a claim or of such entity's ownership interest in property.

11 U.S.C. § 1205(b). Under § 1205(b)(1) the Bank is adequately protected if that $3,000.00 sum compensates it for the decrease in the value of its security interest in the Debtor's property. Debtor also testified that $3,000.00 per month would constitute reasonable market rent for the Property under § 1205(b)(3).

   The only evidence the Court has before it of customary rents in the community where the Property is located is the rental income generated by the two farm houses located on the 100 Acres adjacent to the Property. The evidence is that rents generated by those two homes amounts to $2,250.00 per month. At most, according to the Debtor's testimony, those homes add up to 3,000 square feet. In the aggregate, the homes on the 100 Acres command monthly rents of no less than $0.75 per square foot. By contrast, the Property consists of a 9,000.00 square foot home plus approximately 8 tillable acres. Even assuming a substantially lower $0.50 per square foot rental rate, the home on the Debtors' Property would rent for no less than $4,500.00. Thus, without even taking into account the rental value of the tillable farmland associated with the Property, the Court finds that Debtor's adequate protection offer of $3,000.00 per month falls far short of the rental value of the Property as required by § 1205(b)(3).

   To satisfy § 1205(b)(1), the Debtor's offer of adequate protection would have to compensate the Bank for the decline in the value of its interest in the Property. The Court has no evidence of a decline in market value of the Property. However, the value of the Bank's security interest declines monthly by the amount of interest that accrues on the principal amount of its debt. *See, e.g., In re Ellis*, 478 B.R. 132, 140-41 (Bankr. N.D. N.Y. 2012) (movant was not adequately protected where debtor's adequate protection payments were less than interest due on the movant's debt at the debtor's proposed interest rate). Even at the 4% per annum interest rate that the Debtor expects to propose as part of her chapter 12 plan, that figure amounts to $2,597.17. The evidence is that the Bank paid $4,441.00 to place insurance on the Property before the Debtor filed her bankruptcy case. That expense amounts to $370.08 monthly. The evidence also shows that $10,858.89 of property taxes are unpaid. Interest on the unpaid property taxes accrues at the rate of 12% per annum. COLO. REV. STAT. § 39-10-104.5; *Board of County Commissioners v. Shell Western E & P, Inc.*, 12 P.3d 1219, 1220 (Colo. Ct. App. 2000) ("Interest on delinquent taxes is governed by § 39-10-104.5, C.R.S.2000, which provides that interest accrues at the rate of 12% per annum from the date the taxes are due, until paid. There is no compounding of interest under that statute."). That amounts to $108.59 per month. Those items total $3,075.84. That assumes that Debtor will pay the property taxes going forward.

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

Debtor testified that part of her adequate protection offer she will pay future real property taxes as they come due.

Thus, on its face, the Debtor's adequate protection offer falls just short.  Assuming the reliability of the promised $3,000.00 monthly payments from Aaron Million, the evidence does not convince the Court that the Debtor has the wherewithal to pay the $5,748.22 yearly property tax on her current reported income.  There is no current income from farming operations and the Debtor's Amended Schedules I & J show a surplus of income over expenses of just $70.00 per month.  On a monthly basis, real estate taxes on the Property accrue at the rate of $479.02 per month.  Consideration of that expense boosts the Bank's entitlement to adequate protection to somewhat over $3,500.00 per month.

The Debtor's $3,000.00 per month adequate protection offer falls short of compensating the Bank for the monthly deterioration in its security interest by at least $500.00 per month.  Therefore, the Court finds that "cause" exists under 11 U.S.C. § 362(d)(1) for lifting the automatic stay.

## III.  CONCLUSION

The Court will grant the Motion and lift the automatic stay.  The Court places its primary reliance on  its finding that the Property is not necessary for the Debtor's reorganization under 11 U.S.C. § 362(d)(2).  In the early days of a reorganization case, the Debtor's burden is relatively low to make a showing that property is necessary for an effective reorganization but the Debtor's evidence does not meet that standard.

In *Timbers* the Supreme Court articulated a two part test under § 362(d)(2)(B) to show that property is necessary for an effective reorganization.  The first question the Court asks is whether the Debtor has demonstrated that the Property is essential to her proposed plan.  The totality of the evidence convinces the Court that the opposite is true.  There is no reliable evidence that the Property is capable of producing the income required to service the debt to the Bank; pay real property taxes; pay the costs of insurance; pay the costs of maintaining the Property; and, after considering those expenses related directly to retaining the Property, to produce positive revenues to fund the Debtor's plan.  Even considering the value to the Debtor of being able to continue living in the home situated on the Property, the evidence in the record persuades the Court that the Property represents a net revenue loss to the chapter 12 estate.  The Debtor's income projections have no evidentiary support and there is no historical evidence of the Property generating the level of income the Debtor projects.  Nor do those projections withstand scrutiny when, according to the Debtor, she bases them on prices elevated by the recent drought in conjunction with normal production levels.

The second part of the *Timbers* analysis is to consider whether the Debtor has proposed a plan that stands a reasonable chance of attaining confirmation within a reasonable time –

ORDER ON MOTION FOR RELIEF FROM STAY
Case No. 12-32462 HRT

whether the Debtor has a plan in prospect.  Even if the Court could find that the Property is capable of generating positive revenue stream to assist the Debtor in funding her plan, the Court cannot find that the other revenue sources the Debtor relies on are dependable enough to support confirmation of a chapter 12 plan.  All of the other revenue sources testified to by the Debtor depend upon income generated by properties which the Debtor does not own and in which the Debtor possesses no legal rights.

In accordance with the above discussion, it is

**ORDERED** that the *Motion for Relief from Stay* (docket #7) filed by Verus Bank of Commerce (docket #7) is GRANTED.

Dated this  21st  day of February, 2013.

**BY THE COURT:**

Howard R. Tallman, Chief Judge
United States Bankruptcy Court